Good morning. David Porter on behalf of Richard W. Earle, the petitioner in this matter. I'd like to note that Father Stephen Barber, the pastor, the chaplain at San Quentin Prison is in the courtroom this morning. He wrote a letter on behalf of Mr. Earle that's in our request for judicial notice. The counsel, that goes beyond the record that's before the court, correct? Yes, it is, Your Honor. That's why we phrased it as a request for judicial notice. I'd like to first address the court's issues raised in the court's supplemental briefing order, the intra- and inter-jurisdictional analyses. The warden suggests that there are, and cites, three cases, State cases, for the proposition that there are similar or less egregious criminal histories of petitioners who have been given three-strike sentences in California. That's simply not true. The three cases cited, one is People v. Terry. There was absolutely no information given on the criminal history of that defendant. And, in fact, that case was remanded for a Romero motion. In People v. Montanez, the court noted that there was at least ten felony convictions and four prior prison, separate prison terms for that defendant. No information is given specifically about what those felony convictions were. And in Goodwin, the defendant had two burglary convictions, numerous drug convictions, battery, and pending charges of spousal abuse and a torture offense. So I think that it's very clear that this case, like Romero's v. Castro, the intra-jurisdictional analysis points in only one direction, and that is that Mr. — it confirms the gross disproportionality of Mr. Earle's sentence. As far as the inter-jurisdictional analysis goes, I don't think there's any serious question here either. In the district  of Vermont, also a discretionary life sentence was available, but the defendant would be eligible for parole after just 12 months. In this case, under California three-strike law, the minimum sentence is an absolute minimum sentence. In other words, there is no good-time credit available. Mr. Earle will have to spend a minimum of 26 years in prison before he is even eligible for parole, and that is, of course, if he lives that long. He is — he turned 36 last month, Your Honor, but as we note in the request for judicial notice, he has malignant melanoma, which has not been identified as metastasized to the lymph nodes. I'd like to address the juror misconduct issue. There is no question here. It's not disputed that it was an abuse of discretion for the judge not to have voir dire the jurors who were accused of the misconduct. The question is, then, what is the remedy? What is — was there a substantial injurious effect on the verdict? Now, the State Court of Appeal kept saying, well, they didn't discuss the evidence. They didn't discuss the evidence. There's no problem here. There's no real showing of prejudice. Well, of course they discussed the evidence. The four jurors, the clerk says the four jurors were saying to each other, well, why don't they just ask that one question? That would, you know, solve the whole case for us. Just why don't they ask that one question? There was something that was held beforehand. So it was imperative that the judge hold a hearing, bring those jurors in, question them immediately as to what happened, and then the record would have been clear whether there was prejudice or not, what was said by whom. And as we say — we quote the Smith v. Phillips case, United States Supreme Court case on page 7 of our reply brief. The court there said due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Now, here, the Court never determined what happened. The Court didn't hold a hearing and ask those jurors when first asked. The Court said it was going to voir dire the jurors, but then it did not. And then it wasn't until three months later that the defense was given an opportunity to investigate. The investigator went out and talked to some of the jurors, but not all, who were involved in this clear misconduct. But the Court never held a hearing then. It held argument on the defendant's motion for a new trial. What was the product of that investigation? Was there anything to suggest that there was a new trial? No, Your Honor, there wasn't. But only two of the four — What would have the hearing — what would have triggered at that point the requirement of a hearing? But, Your Honor, it's important to note that only two of the four jurors who were involved in the misconduct were even interviewed by the investigator. So I'm failing to understand the significance of the interviews. In other words, if they all come back negative, what's the reason for the hearing? To compel the others to come in and testify? To compel the others. As we know, there is a big difference between three months later being given the opportunity for an investigator to go out in the field and ask the jurors questions. No, I understand that. But you were arguing that there's constitutional error in the failure to conduct a hearing after the investigator reports. Well, and before. Well, I understand the before. I'm just trying to understand — Oh, I see. You're separating out the two. — why it's — you're just saying it's all part of the same shtick. They should have done it all at the beginning and it doesn't get cured and it's not enough not to have done it if they didn't do it the first time. At least they should have done it after the investigator reports. That's true. And also as to the other two jurors who were involved in the misconduct. We have no — there's no dispute about who they were. The clerk was able to identify the jurors by their numbers. Okay. All right. Anything — do you want to save the time for — I'll reserve the rest of my time. Okay. Good morning, Your Honors, and may it please the Court. My name is Mark Johnson, Deputy Attorney General for the California Department of Justice, appearing on behalf of Respondent. Before I begin to discuss anything or answer any questions, I would like to object to Petitioner's request for judicial notice of the documents for numerous reasons. They were not presented to the State courts. They weren't irrelevant to the issues that are before this Court, which both deal with whether — whether appellant's sentence — or whether the State court's determination that appellant's sentence did not violate the Constitution was unreasonable in light of the United States Supreme Court precedent. Okay. It's our position that it was. I'll first note that in response to this Court's request for further briefing on the issue, I've taken over this case from another that the comparative analysis set forth in Ramirez is inapplicable here because this case is far more aggravated than Ramirez, in fact, is far more aggravated than was even in the case in Andrade or in Solem v. Helm. And therefore, under that Supreme Court precedent, the State court's finding that this sentence did not constitute cruel and unusual punishment in violation of the Eighth Amendment could not have been objectively unreasonable. If there's no further questions about that, I'll briefly move on to the misconduct claim. In this case, the Court is aware of the facts. Before you leave, in the realm of judicial notice, what significance, if any, is there in the fact that the district attorney of Los Angeles is promoting a ballot initiative to restrict the scope of the Free Strikes Law because in his view, the Free Strikes Law imposes unduly harsh punishment? That is a factor at all into the intra-jurisdictional analysis? No, Your Honor. That's a political question that may be set before the citizens of California to decide. And this is and if the people of California decide that the Three Strikes Law needs to be revised, then that's for them to determine. But as the Three Strikes stands right now, it's been found to be constitutional in cases less extreme than this one. But Ramirez found it unconstitutional as applied in an exceptional circumstance and the voters can't undermine, override, at least override the Eighth Amendment. So if the chief law enforcement officer for Los Angeles County is publicly stating that the sentences imposed under the mandate of the Three Strikes Law are, paraphrasing on what you said, they're grossly disproportional, is that not a datum that can be considered along with taking a look at the outcomes in various other cases? It could be something that could be considered by the state courts theoretically, although it is merely the opinion of one elected official in Los Angeles County. It's not a judicial finding of anything. So far as the question presented in this court on a habeas matter, it is irrelevant. The only issue is what the Supreme Court has to say on this matter. And with respect to Ramirez, as I pointed out in my brief, this case is far, far more aggravated than Ramirez. Ramirez, the Court pointed out, is a very extreme example of the application of the Three Strikes Law. This case, while I'm not here to argue that this is not a harsh sentence or that Mr. Earle is the most egregious offender under California Three Strikes Law, he is, however, far more egregious than it was the case in Ramirez or, as I said before, in Andrade or even in Solon v. Helm. Now, all of his prior crimes were nonviolent. Isn't that correct? The defendant here? Yes. The defendant here had – it depends how you categorize violent crimes. The defendant here has six prior convictions for residential burglary. And while that's not a crime that intrinsically involves violence, it is a very serious crime that that's – that often, as the Court's well aware, leads to violence and very serious violence at that. And additionally, the crime is so serious that there – although it may not inflict physical violence in every case, I would submit that it's a crime that creates very serious and real trauma upon its victims when the sanctity of their home is violated and that protective barrier is violated. It – Are there six separate – six separate residential burglaries? Three – six separate residential burglaries, so far as I understand, three separate convictions. The first two involving jail time. The first one, an 88 offense involving 280 days jail time. The second one, an 89 offense involving 120 days jail time. The third one involving four separate offenses and an 8-year prison term. And now, what's significant – I just want to make sure, though, to test my recollection, that there were six separate residences that were burgled. That's my understanding, yes. And what's – what's particularly significant in this case, in my view at least, is that after being released from prison, this defendant then offended again, apparently very shortly after being released from prison for these burglary convictions, by being caught in possession of a loaded firearm as an ex-felon. Now, this – this conviction, this offense happened at a time when the defendant could have been sentenced under the three-strikes law to a sentence of 25 years to life. He was not. He was given a break at that point, and yet he continued to offend with this – with this conviction that he's – that he stands convicted for now. Insofar as the misconduct claim is concerned, I have not much to say about it. Our positions are well set forth in the brief. I do want to add, however, that although the court did not – did not halt deliberations right then and there, which would have been a very cumbersome procedure to do at that point, the court did allow the defense to question the jurors in question immediately after the – the verdict was rendered. And so this isn't a position where he didn't have an opportunity to seek the very information. We've got at least the ones that have not requested anything. Right. And apparently, he was able to speak with all of the jurors that – that he alleged may have committed this misconduct. And on the record here, it – it – everything appears to be quite reasonable. They – it does – there's – there's nothing beyond speculation to suggest that they were saying anything other than criticizing the counsel's – counsel's objections and – and the way they carried out the trial. If that's misconduct, we're going to have misconduct in every case. There is a jury, I'm afraid, or just about every case, because, I mean, human nature, you know, is – and – and the nature of lawyers, when put in the same room, there is a lengthy nature of the proceedings and the questioning often in these criminal cases. If there's no further questions. I have just one question. Where along the spectrum of seriousness of the sentences does California stand? Is it pretty much to the far end of the most severe? You mean for recidivists, Your Honor? It appears that California is – is on the – the – Number one in something. It's – yeah, we're number one in a lot of things. Not all good. Not all bad. I – I don't know if Mr. Earle would have – could have received a greater sentence in some other State. It's possible that he may. The fact that – that California may be number one in this is – does not by itself, as the Supreme Court has elucidated, it does not by itself render the – the sentence suspect under the Eighth Amendment. But maybe it's something we shouldn't be very proud of. Well, that's – and again, Your Honor, that's – that's not for us to decide as – that's for us to decide as citizens. And if we feel strongly about it, strongly enough about it, then maybe at the ballot box as citizens, maybe we will, maybe we will not. But it's something for the – for the voting citizens of the State of California to decide. Any further questions? Let me just clear up a few misunderstandings. First of all, the materials submitted in our motion for judicial notice are not irrelevant to the issues. As Ramirez – the Ramirez court makes clear, it's cited very specifically in Ramirez that the judge – that the prisoner – that Mr. Ramirez had been a model inmate during his six years in prison, makes note of the people who came to the courtroom in support of him that morning in the Ninth Circuit. That's been reflected in the record on appeal, right? That was – the court took, I guess, judicial notice of that at the time of the hearing. It does not say it was in the record. It couldn't have been in the record because it's happening right in front of the court of appeals at that moment. The second point, the warden's representative said that burglaries could lead to violence. The point – the whole point of the Ramirez case is that this court is obligated to look beyond the labels. In Mr. Ramirez's case, the two priors were robberies. Those are kind of by definition against the person and involve some sort of threat or threat of force or force. But the court looked beyond the labels of those convictions to see what actually happened. And in this case, there has never been any contention that violence or weapons were involved in any of the burglaries in Mr. Earls. The lawyer's argument was that when you invade somebody's house, there is no potential. That is correct. The fact that it could come upon somebody who was a slave or a veteran is the fact that it didn't, but nonetheless, it's a breaking and entering. It's not a cop lifting. That's certainly correct, Your Honor, but robbery could also obviously lead to violence, could lead to serious injury. And yet the Ramirez court teaches us that that's not the end of the inquiry. A correction on the juror misconduct claim. The court did not allow the defense immediately after the verdict to go out and interview the jurors. In fact, it was about three months after the verdict where the jurors were finally contacted. Were contacted or were allowed? Well, there was a hearing, Your Honor, set two months after the verdict on November 13th, where the jurors were asked to come into court and say whether they allowed their – they were going to submit to interviews. The wrong jurors were called by the court. And then the next month there was another hearing. That was 12-18 already, which is three months later, where three jurors appeared and opposed. Seven jurors, the other seven, they let. And is it true that all of the ones involved in the smoking were in fact interviewed? No, it is not correct. There were two jurors who were not interviewed. Juror number one was not interviewed. She did not allow her information to be given out. She faxed the court. Another one of those jurors came in to court and said we're going to do this. All right. Thank you very much, counsel. We appreciate both of your arguments. Thank you. And the case argued is submitted.
judges: B. Fletcher, Beezer, Fisher